UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

E.S.,

           Plaintiff,

     v.

KILOLO KIJAKAZI,

          Defendant.

Case No. 20-cv-06550-JCS

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 21, 26

## I.   INTRODUCTION

On August 2, 2017, Plaintiff E.S.[1] applied for supplemental security income ("SSI") under Title XVI of the Social Security Act, alleging disability beginning April 4, 2017. The claim was denied initially and upon reconsideration, and an administrative law judge ("ALJ") held a hearing on November 14, 2019. On December 31, 2019, the ALJ denied E.S.'s application, and on July 22, 2020, the Appeals Council denied review of E.S.'s appeal of the ALJ's decision, making it the final decision of the Defendant Commissioner of the Social Security Administration ("Commissioner").

After the Appeals Council denied review, E.S. sought review in this Court pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' cross-motions for summary judgment. For the reasons stated below, the Court GRANTS E.S.'s motion for summary judgment, DENIES the Commissioner's motion for summary judgment, and REMANDS for further proceedings.[2]

---

[1] Because opinions by the Court are more widely available than other filings and this Order contains potentially sensitive medical information, this Order refers to Plaintiff using only her initials.

[2] The parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). Additionally, the Court notes that on March 3, 2022, the Court ordered the

## II.     BACKGROUND

### A.     The Five-Step Regulatory Framework

Disability insurance benefits are available under the Social Security Act (the "Act") when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). A claimant is only found disabled if their physical or mental impairments are of such severity that they are not only unable to do their previous work but also "cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has established a sequential, five-part evaluation process to determine whether a claimant is disabled under the Act. *See Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. *Id.* "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Id.*

At step one, the ALJ considers whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i).[3] If the claimant is engaged in such activity, the ALJ determines that the claimant is not disabled, and the evaluation process stops. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ continues to step two. *See id.*

At step two, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment" or combination of such impairments that meets the regulations' twelve-month durational requirement. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). An impairment or combination of impairments is severe if it "significantly limits [the claimant's] physical or

---

Commissioner to perfect the administrative record, which was missing "Exhibit 14F." On March 17, 2022, the Commissioner submitted the missing portions of the record, and the record is now complete.

[3]The Court cites the regulations applicable to disability insurance benefits applications because the parallel SSI regulations are virtually identical.

1   mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have

2   a severe impairment, disability benefits are denied.  20 C.F.R. § 404.1520(a)(4)(ii).  If the ALJ

3   determines that one or more impairments are severe, the ALJ proceeds to the next step.  *See id.*

4       At step three, the ALJ compares the medical severity of the claimant's impairments to a

5   list of impairments that the Commissioner has determined are disabling ("Listings").  *See* 20

6   C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If one or a combination

7   of the claimant's impairments meets or equals the severity of a listed impairment, the claimant is

8   disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the analysis continues.  *See id.*

9       At step four, the ALJ must assess the claimant's residual functional capacity ("RFC") and

10  past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  The RFC is "the most [a claimant] can still

11  do despite [that claimant's] limitations . . . based on all the relevant evidence in [that claimant's]

12  case record."  20 C.F.R. § 404.1545(a)(1).  The ALJ then determines whether, given the claimant's

13  RFC, the claimant would be able to perform their past relevant work.  20 C.F.R. § 404.1520(a)(4).

14  Past relevant work is "work that [a claimant] has done within the past fifteen years, that was

15  substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it."

16  20 C.F.R. § 404.1560(b)(1).  If the claimant is able to perform their past relevant work, then the

17  ALJ finds that they are not disabled.  If the claimant is unable to perform their past relevant work,

18  then the ALJ proceeds to step five.

19      At step five, the Commissioner has the burden to "identify specific jobs existing in

20  substantial numbers in the national economy that the claimant can perform despite [the claimant's]

21  identified limitations."  *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (quoting *Johnson v.*

22  *Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the Commissioner meets this burden, the

23  claimant is not disabled.  *See* 20 C.F.R. § 404.1520(f).  Conversely, the claimant is disabled and

24  entitled to benefits if there are not a significant number of jobs available in the national economy

25  that the claimant can perform.  *Id.*

26  **B.   Supplemental Regulations for Determining Mental Disability**

27      The Social Security Administration ("SSA") has supplemented the five-step general

28  disability evaluation process with regulations governing the evaluation of mental impairments at

United States District Court
Northern District of California

3

1    steps two and three of the five-step process.  *See generally* 20 C.F.R. § 404.1520a.  First, the

2    Commissioner must determine whether the claimant has a medically determinable mental

3    impairment.  20 C.F.R. § 404.1520a(b)(1).  Next, the Commissioner must assess the degree of

4    functional limitation resulting from the claimant's mental impairment with respect to the

5    following functional areas: 1) understand, remember, or apply information; 2)  interact with

6    others; 3) concentrate, persist, or maintain pace; and 4) adapt or manage oneself.   20 C.F.R. §§

7    404.1520a(b)(2), (c)(3).  Finally, the Commissioner must determine the severity of the claimant's

8    mental impairment and whether that severity meets or equals the severity of a mental impairment

9    listed in Appendix 1.  20 C.F.R. § 404.1520a(d).  If the Commissioner determines that the severity

10   of the claimant's mental impairment meets or equals the severity of a listed mental impairment,

11   the claimant is disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the evaluation proceeds

12   to step four of the general disability inquiry.  *See* 20 C.F.R. § 404.1520a(d)(3).

13          Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the

14   presence of various listed mental impairments, but all listed mental impairments share certain

15   "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity

16   criteria).  *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00.  Any medically determinable

17   mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more listed mental

18   impairments—is sufficiently severe to render a claimant disabled if it also satisfies the general

19   Paragraph B criteria, which requires that a claimant's mental disorder "result in 'extreme'

20   limitation of one, or 'marked' limitation of two, of the four areas of mental functioning."  *Id*. at

21   12.00(A)(2)(b). A claimant has a "marked" limitation if the claimant's "functioning in this area

22   independently, appropriately, effectively, and on a sustained basis is seriously limited."  20 C.F.R.

23   § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(d).  A claimant with an "extreme" limitation is "not able

24   to function in this area independently, appropriately, effectively, and on a sustained basis."  20

25   C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(F)(2)(e).

26          This evaluation process is to be used at the second and third steps of the sequential

27   evaluation discussed above.  Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The

28   adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C'

4

1    criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at

2    steps 2 and 3 of the sequential evaluation process.")  If the Commissioner determines that the

3    claimant has one or more severe mental impairments that neither meet nor are equal to any listing,

4    the Commissioner must assess the claimant's residual functional capacity.  20 C.F.R. §

5    404.1520a(d)(3).  This is a "mental RFC assessment [that is] used at steps 4 and 5 of the

6    sequential process [and] requires a more detailed assessment by itemizing various functions

7    contained in the broad categories found in paragraphs B and C of the adult mental disorders

8    listings in 12.00 of the Listing of Impairments . . . . "  Social Security Ruling 96-8p, 1996 WL

9    374184, at *4.

10        **C.**        **Factual Background**

11        E.S. was fifty-two years-old at the time of her alleged onset date in 2017.  E.S. has a

12   business degree, and she previously worked for several years as a bank support analyst at a call

13   center, answering phone calls and assisting customers with online banking questions.

14   Administrative Record ("A.R.") 34-35.  She worked at her desk utilizing a headset, where she sat

15   for approximately eight to nine hours per day with the exception of lunch and breaks.  *Id.* at 41.  In

16   2007, E.S. began experiencing increasing back pain due to spinal stenosis, herniated discs, and

17   sciatica, and, as a result, she was unable to sit for "long periods of time" and thus was unable to

18   continue working at the bank.[4]  *Id.* at 33, 34, 36-37, 634.

19        Prior to 2014,  E.S. received care for her back at St. Luke's Hospital, including several

20   epidural steroid injections ("epidurals").  *Id.* at 36, 260.[5]  E.S.'s back impairments resulted in

21   chronic leg weakness such that E.S. suffered multiple falls with injuries that exacerbated both her

22   back pain and sciatica.  *Id.* at 260-61, 674.  One such fall occurred in 2013, when E.S. fell and

23   fractured her ankle, necessitating surgery to insert pins into her ankle.  *Id.* at 532-92.

24        Following her ankle surgery, in March 2014, E.S. began treatment at UCSF for her back

25   impairments, at which time she was already taking oxycodone for the pain.  *Id.* at 674.  She was

26

27   _____

     [4] E.S. stated that her back pain first commenced after she gave birth in 1998.  A.R. 674.

28   [5] The St. Luke's records were not included in the administrative record.

United States District Court
Northern District of California

treated at UCSF for her back impairments from March 2014 through her November 2019 hearing, primarily by orthopedist, Dr. Sibel Deviren.  *See*, *e.g.*, *id.* at 674 (March 2014 progress notes from anesthesiologist, Dr. Melanie Henry); 593-98 (May 2015 progress notes from Dr. Deviren); 753 (October 2019 progress notes from Dr. Deviren).  From 2014-2019, E.S. underwent several MRIs ("magnetic resonance imaging" tests), and Dr. Deviren diagnosed degenerative disc disease, facet arthropathy,[6] severe bilateral neural foraminal stenosis,[7] and mild spinal canal stenosis with disc extrusion.[8]  *Id.* at 284, 374, 696, 748, 752.  E.S.'s most recent May 2019 MRI also revealed degenerative changes to her cervical spine, including severe cervical neural foraminal narrowing.  *Id.* at 752.

During several visits from 2015-2019, Dr. Deviren and other UCSF clinicians noted that E.S.'s daily living activities were limited due to pain stemming from her back impairments.  *See id.* at 743 (Dr. Deviren notes that E.S.'s back and leg pain has become even more intense and is "severely limit[ing] her activities of daily living"); *see also id.* at 598, 638.  As E.S.'s pain persisted, she also struggled with side effects related to her long-term use of oxycodone for her back and leg pain.  *Id.* at 408 (E.S. is treated for withdrawal in November 2017 at Highland Hospital); 260-61 (during July 2017 follow-up visit at UCSF, E.S. notes that she is working to get off oxycodone but having a difficult time "handling" the pain); 277 (E.S. complains of pain and the need for a new oxycodone prescription in September 2017); *cf. id.* at 753 (progress notes from October 2019 stating that E.S. was no longer using oxycodone for the pain).  E.S. commenced treatment at Healthright 360 Clinic ("Healthright") in October 2017 for pain and medication management, including opioid dependence related to her use of oxycodone for her back and leg

---

[6] Facet arthropathy is a form of arthritis affecting joints in the spine.  Stanford Medicine, *Facet Arthropathy*, https://stanfordhealthcare.org/medical-conditions/back-neck-and-spine/facet-arthropathy.html (last visited Sept. 16, 2022).

[7] "Neural foraminal stenosis" refers to "the narrowing of the small openings between each vertebra in the spine, called foramen, which nerve roots pass through," or, in other words, the compression of a spinal nerve.  Medical News Today, *What's to Know About Neural Foraminal Stenosis*, https://www.medicalnewstoday.com/articles/319792 (last visited Sept. 16, 2022).

[8] Spinal canal stenosis is caused by compression or inflammation of the spinal cord which is located in the center of the spine.  Cleveland Clinic, *Spinal Stenosis*, https://my.clevelandclinic.org/health/diseases/17499-spinal-stenosis (last visited Sept. 16, 2022).

1   pain.  *Id.* at 520-21.  E.S. continued to receive care from Healthright clinicians at the time of her

2   November 2019 hearing.  *See id.* at 771-72.

3          E.S. also received multiple epidurals for her pain from 2014-2019, often with mixed

4   results.  *See id.* at 598 (May 2015 progress notes scheduling epidural and noting that E.S. had

5   "failed to respond to conservative treatments"); 635-38 (E.S. returns to UCSF in October 2015

6   with continued complaints of back pain); 260-61, 281 (E.S. receives another epidural in July 2017

7   for back and leg pain); 277-80 (E.S. reports post-epidural pain in September 2017, asserting that

8   injection did not alleviate pain); *but see id.* at 280 (UCSF clinician notes that "documentation

9   immediately following E.S.'s injection recorded one hundred percent reduction of her pain"); 326

10  (E.S. complains of severe neck and left arm pain to Dr. Deviren in April 2018, but states that her

11  "back pain is much better"); 743 (E.S. returns to Dr. Deviren in March 2019 with intense back and

12  leg pain in new locations with numbness); 753 (following 2019 epidural, E.S. states she is happy

13  with results because her leg pain is "all gone," but her back pain still limits her activities).

14         At her ALJ hearing, E.S. testified that she experiences back pain "all the time," and that

15  prior to the epidurals, she required assistance just to get out of bed every day.  *Id.* at 42-43.  She

16  estimated that, on average, her pain was a "five to six" on a scale of one to ten.  *Id.* at 42.  While

17  the injections help with her sciatica, they do not prevent her back spasms, neck and shoulder pain,

18  and her back pain continues to become progressively worse over time.  *Id.* at 42-43.  E.S. also

19  suffers from numbness and tingling, headaches, and ankle pain related to her fractured ankle.  *Id.*

20  at 44-45.

21         E.S. is no longer able to wash dishes, but she does shower and let her dogs outside every

22  day.  *Id.* at 39.  She has approximately three medical appointments per week, and her daughter

23  often helps her.  *Id.* at 39-40.  Because of her pain, E.S. has difficulty concentrating, and it often

24  takes her three hours to complete a chore or task that would have previously required forty-five

25  minutes to complete.  *Id.* at 43-44.  While E.S. helps to care for her own elderly mother by

26  providing medication reminders, she is unable to assist her mother physically.  *Id.* at 44.

27         E.S. also testified that she "can't sit for very long."  *Id.* at 41.  At the hearing, she noted

28  that it had been "an hour already since we've been here," and that her back was "hurting bad."  *Id.*

1   She further testified that in order to relieve her pain, she needed to "[g]et up slowly, walk, or lay

2   down," and that she would be unable to return to her prior job unless she were allowed a "chair[]

3   that recline[s]." *Id.*

4       **D.    ALJ's Decision**

5       The ALJ ultimately determined that E.S. was not disabled at step four of the disability

6   determination. *Id.* at 22.  At step one, the ALJ concluded that E.S. had not engaged in substantial

7   gainful activity since August 2, 2017, her application date. *Id.* at 18.  Subsequently, at step two,

8   the ALJ determined that E.S.'s spinal stenosis and degenerative disc disease constituted severe

9   impairments, but that her headaches, osteoporosis, hypertension, and depression were not severe.

10  *Id.* at 18-19.  For each of the latter conditions, the ALJ provided an explanation as to why the

11  condition was not "severe." *Id.* at 19.

12      At step three, the ALJ found that E.S.'s impairments, even in combination, did not meet or

13  equal in severity any of the listed impairments. *Id.*  In making this determination, the ALJ

14  addressed whether paragraph B criteria of the listings were satisfied. *Id.* at 21-23.  The ALJ found

15  that E.S. had no limitations in any of the four functional categories of paragraph B. *Id.*

16      At step four, the ALJ found that E.S. had the residual functional capacity ("RFC") to

17  perform light work with the following modifications:

19          [E.S.] could lift twenty pounds occasionally and ten pounds frequently.  [E.S.]
20          could occasionally carry twenty pounds and frequently carry ten pounds.  [E.S.]
            could sit for six hours, stand for four hours, and walk for four hours in an eight-
            hour workday.  [E.S.] could push and pull as much as she can lift and carry.
21          [E.S.] can occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs.
            [E.S.] could never climb ladders, ropes, or scaffolds.  [E.S.] could frequently
22          balance.  [E.S.] can never work at unprotected heights.  Additionally, she needs
            to alternate sit/stand momentarily each hour (she would not be off task with
23          headphones).

25  *Id.* at 20.  In reaching this RFC, the ALJ found that E.S.'s medically determinable impairments

26  could reasonably cause the symptoms she alleged, but that her "statements concerning the

27  intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with

28  the medical evidence and other evidence in the record." *Id.* at 21.  The ALJ also found that the

United States District Court
Northern District of California

8

RFC opinions of the non-examining state agency medical consultants were persuasive, but rejected the RFC opinion of E.S.'s examining physician's assistant as not persuasive.[9] *Id.* at 22.

Subsequently, at step four, the ALJ determined that E.S. was able to perform her past relevant work as a user support analyst based on her RFC. *Id.* at 22. The ALJ thus found E.S. not disabled at step four and did not proceed to step five. *Id.* at 23.

## III.   ISSUES FOR REVIEW

E.S. seeks reversal of the Commissioner's denial of benefits for five reasons, arguing that:

(1)     the ALJ improperly rejected E.S.'s symptom testimony;

(2)      the ALJ erred in evaluating the persuasiveness of medical opinions from:

(a)     examining physician's assistant ("PA"), Stephanie Yeh; and

(b)     state agency consulting physicians, Drs. DeSouza and Herman;

(3)     the ALJ failed to properly develop the record;

(4)     the ALJ erred in evaluating E.S.'s RFC; and

(5)     the ALJ erred in failing to evaluate E.S.'s disability at step five of the sequential analysis.

## IV.   DISCUSSION

### A.     Standard of Review

District courts have jurisdiction to review the final decisions of the Commissioner and may affirm, modify, or reverse the Commissioner's decisions with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3). "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at

---

[9] The Court acknowledges that what were previously considered "opinions" from state agency medical and psychological consultants have now been relabeled as "prior administrative medical findings." 20 C.F.R. § 416.913(a)(5); *see also* Revisions to Rules, 2016 WL 4702272, 81 Fed. Reg. 62560-01, at 62564 (Sept. 9, 2016). However, because "prior administrative medical findings" continue to be treated the same as other medical opinions, for clarity, the Court continues to refer to the "prior administrative medical findings" as "opinions" throughout this Order. *See* 20 C.F.R. § 404.1520c (considering "prior administrative medical findings" in the same manner and using the same factors as "medical opinions"); *see also* 81 Fed. Reg. 62560-01, at 62564 ("We would consider and articulate our consideration of prior administrative medical findings using the same factors we use to consider medical opinions from medical sources.").

1097.  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion" and that is based on the entire record.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than preponderance."  *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (internal citation omitted).  Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).  In reviewing the record, the Court must consider both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

## B.       Rejection of E.S.'s Symptom Testimony

The ALJ rejected E.S.'s testimony regarding the "intensity, persistence and limiting effects of [her] symptoms" as "not entirely consistent with the medical evidence and other evidence in the record" for four reasons:

(1)       E.S.'s physical examinations showed "minimal findings" in that she "did not have swelling, edema, deformity, or spasms;"

(2)       the record contained inconsistent statements about E.S.'s symptoms;

(3)       E.S.'s gait was "typically normal;" and

(4)       E.S. was "well[-]developed and not in acute distress."

A.R. 21.

### 1.       Legal Standards

In assessing a claimant's subjective testimony, an ALJ conducts a two-step analysis. *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017).  The ALJ must first determine "whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)).  If the claimant does so, and there is no affirmative evidence of malingering, then the ALJ can reject the claimant's testimony as to the severity of the symptoms

"'only by offering specific, clear and convincing reasons for doing so.'" *Tommasetti v. Astrue*, 1039 (9th Cir. 2008) (quoting *Smolen*, 80 F.3d at 1281). These reasons must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). "General findings are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

### 2.   Analysis

E.S. presented substantial objective medical evidence of her back impairments, including multiple MRI results, which "could reasonably be expected to produce the . . . symptoms alleged." *Anderson v. Saul*, 783 F. App'x 697, 698 (9th Cir. 2019) (quoting *Lingenfelter*, 504 F.3d at 1036); *see also* A.R. 284 (discussing July 2014 MRI); A.R. 284 (discussing and comparing August 2017 MRI with July 2014 MRI); A.R. 752 (discussing May 2019 MRI). Because the ALJ found that "[E.S.]'s medically determinable impairments could reasonably be expected to cause the alleged symptoms" and did not point to any affirmative evidence of malingering, A.R. 21, the ALJ needed to provide "specific, clear and convincing reasons" for rejecting E.S.'s testimony concerning the intensity, persistence, and limiting effects of her symptoms. *Tommasetti*, 533 F.3d at 1039. For the reasons below, the ALJ failed to do so, and his rejection of E.S.'s testimony, therefore, was not supported by substantial evidence.

### a.   "Minimal Findings" at Physical Examinations

In rejecting E.S.'s symptom testimony, the ALJ cited to progress notes from a September 25, 2017 visit at UCSF following E.S.'s July 31, 2017 epidural. *See* A.R. 21 (citing *id.* at 321). As the ALJ correctly noted, PA Neria stated that although E.S. presented with back pain, she exhibited "no swelling, no edema, no deformity, and no spasm." *Id.* at 321. However, the ALJ omitted that, on that particular day, E.S. had returned to UCSF for yet another epidural following "continuous complaints of low back pain, rated a [seven out of ten] on the pain scale." *Id.* at 318. Furthermore, orthopedist Dr. Deviren's diagnosis for the cited September 25, 2017 visit continued to be "[a]xial lumbar spine pain with bilateral leg pain, central disc extrusion, facet arthropathy, [and] mild spinal canal stenosis with moderate to sever bilateral neural foraminal stenosis at L5-S1." *Id.* at 323. Dr. Deviren additionally observed that same day that E.S.'s lumbar and bilateral leg pain were "major limitation[s]" to her activities of daily living. *Id*.

Thus, the ALJ "cherry-picked" certain "normal" observations from PA Neria's September 25, 2017 notes, which did not, in fact, undermine E.S.'s testimony regarding her pain. *See Diedrich v. Berryhill*, 874 F.3d 634, 642 (9th Cir. 2017) (improper for ALJ to "cherry-pick" absence of certain symptoms from medical evidence as opposed to undertaking a "broader development" of the evidence in its entirety); *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014) (holding that "cherry-picked" evidence about a claimant's activities does not provide a clear and convincing reason for rejecting her symptom testimony). Accordingly, this reason is neither clear nor convincing.

### b. Inconsistent Symptom Statements

The ALJ also suggests that E.S.'s medical record contained inconsistent statements regarding her pain, citing again to PA Neria's notations from the September 25, 2017 visit, during which E.S. received her second epidural in two months for her back and leg pain. A.R. 318. During that visit, E.S. advised PA Neria that the prior July 31, 2017 epidural "did not reduce her pain." *Id.* PA Neria noted, though, that according to "[UCSF's] immediate documentation post[-]injection" on July 31, 2017, E.S. "reported a one hundred percent reduction of her pain." *Id.*

The administrative record, unfortunately, does not contain the July 31, 2017 post-procedure "documentation" referred to by PA Neria. *See id.* at 281-83. It does, however, contain Dr. Deviren's July 31, 2017 post-epidural progress notes, which state simply that E.S. "tolerated the procedure well," "there were no complications," and that E.S. was "awake and alert on leaving the Surgery Center." *Id.* at 282. Even if the Court were to assume that immediately after the July 31, 2017 epidural, E.S. indeed stated that her pain had been reduced one hundred percent, there is no dispute that any such reduction in pain was short-lived. That is because, on September 5, 2017, E.S. returned to UCSF, and reported that the injection did not help, and that her pain is "back to baseline." *Id.* at 277. During that September 5, 2017 visit with Dr. Deviren and PA Huffstutter, E.S. complained of increased back pain, forearm pain and tingling, tingling and swelling in her feet, and that "her legs have given way." *Id.* The pain continued, necessitating another epidural later in September 2017. *Id.* at 321. Accordingly, any post-epidural statement regarding an immediate improvement in pain was not inconsistent with E.S.'s pain testimony given that the record also indicates that E.S.'s pain waxed and waned over time.

1    Similarly, the additional April 2018 visit progress notes cited by the ALJ do not render

2  E.S.'s pain testimony inconsistent with her medical record.  Approximately six months after her

3  September 25, 2017 epidural, at a follow-up visit at UCSF with Dr. Deviren, E.S. advised her

4  orthopedist that her back pain was "much better" at the time, but that she was now experiencing

5  severe neck and arm pain, numbness and tingling, and "flank pain" on her left side.  *Id.* at 326.

6  She also reported feeling unbalanced when she was walking.  *Id.*  Upon examination, Dr. Deviren

7  noted that E.S. experienced "severe pain in every direction" with her cervical spine.  *Id.*  Dr.

8  Deviren ordered and reviewed additional x-rays and found that, in addition to E.S.'s existing

9  lumbar impairments, the x-rays now demonstrated cervical degeneration as well.[10]  *Id.* at 330.  Dr.

10  Deviren prescribed additional pain medication for E.S. and ordered a cervical MRI, which

11  subsequently showed "multilevel degenerative changes of the cervical spine."  *Id.* at 752.

12    E.S.'s lower back pain may not have been her chief complaint at the cited April 2018 visit,

13  but it nevertheless persisted.  E.S. was seen at an emergency room the following month with

14  complaints of increasing back pain and was subsequently admitted to the hospital.  *Id.* at 363.

15  Additionally, in early 2019, E.S. returned to UCSF with more intense back pain in new and

16  different locations, along with increasing numbness, and Dr. Deviren again observed that the pain

17  "severely limit[ed]" E.S.'s daily activities.  *Id.* at 743.

18    In sum, the September 2017 and April 2018 progress notes do not undermine E.S.'s pain

19  testimony.  The medical record demonstrates that E.S.'s  back pain migrated and waxed and

20  waned over the years.  As recognized by the Ninth Circuit, "[c]ycles of improvement and

21  debilitating symptoms are a common occurrence, and in such circumstances, it is error for an ALJ

22  to pick out a few isolated instances of improvement over a period of months or years and to treat

23

24  _____

[10] Dr. Deviren diagnosed "loss of cervical lordosis and anterior endplate osteophyte."  A.R. 330.

25  A "loss of cervical lordosis" occurs when "the cervical spine in the neck has lost its healthy 'c-
shaped' curvature and becomes straighter, or the curve can be reversed, known as a 'reverse

26  curve.'"  Scoliosis Reduction Center, *Cervical Lordosis and What Causes Cervical Lordosis*,
https://www.scoliosisreductioncenter.com/blog/loss-of-cervical-lordosis (last visited Sept. 16,

27  2022).  An "anterior endplate osteophyte" is a bone spur that occurs at the top of bottom edges of
the cervical vertebrae at the front of the spine.  Stewart G. Eidelson, MD, *Osteophytes*, Spine

28  Universe (Jan. 29, 2020),  https://www.spineuniverse.com/conditions/spondylosis/osteophytes-
bone-spurs.

United States District Court
Northern District of California

them as a basis for concluding a claimant is capable of working." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014); *see also L.L. v. Kijakazi*, No. 20-CV-07438-JCS, 2022 WL 2833972, at *15 (N.D. Cal. July 20, 2022) (citing *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001))(noting that "it is an error to reject a claimant's testimony based on isolated instances of improvement, since symptoms regularly wax and wane during treatment").

This reason, therefore, did not constitute clear and convincing support for rejecting E.S.'s testimony.

### c.    "Typically Normal" Gait

The ALJ also cites to several progress notes in which various clinicians observed that E.S.'s gait was "normal."  A.R. 21 (citing *id.* at 297, 439, 747, 752).  The Court first notes that during one of the cited visits from March 2019, UCSF orthopedist, Dr. Deviren, actually stated that E.S. presented with an "antalgic" gait.[11]  *Id.* at 747.  During that visit, Dr. Deviren ordered yet another MRI as a result of E.S.'s increasingly intense pain.  *Id.* at 743.  Dr. Deviren also ordered another epidural and stated that E.S. may need to "consider surgery."  *Id.* at 748.

In an additional cited visit from July 2017, Dr. Deviren observed a "normal" gait, but also noted that E.S. had "difficulty walking on [her] toes and heels," and that her "[c]linical presentation [was] concerning for bilateral leg weakness, chronic falls, and continued opiate use."  *Id.* at 297.  The ALJ's third citation to visit notes from May 7, 2019, during which E.S. was observed with a "normal" gait, similarly did not undermine E.S.'s pain testimony.  During that visit, Dr. Deviren observed the migration of E.S.'s back and leg pain, noting that the pain was "burning and achy" "up and down [E.S.'s] back [and] shoulders."  *Id.* at 752.  It was also during that particular visit that Dr. Deviren diagnosed the degenerative changes to E.S.'s cervical spine (in addition to her lumbar spine).  *Id.*

The remaining citation to a November 2018 medication management visit with Dr. Jacintho at Healthright Clinic is similarly unconvincing.  That visit did not pertain to E.S.'s back

---

[11]"Antalgic" refers to "an abnormal pattern of walking secondary to pain that ultimately causes a limp, whereby the stance phase is shortened relative to the swing phase," and is typically caused by "an abnormality . . .  in one of the joints, muscles, or bones of the complex system that regulates gait."  Nadja Auerbach & Prasanna Tadi, *Antalgic Gait in Adults*, National Library of Medicine (July 4, 2022), https://www.ncbi.nlm.nih.gov/books/NBK559243/#:~:text=Antalgic%20gait%20is%20one%20of,relative%20to%20the%20swing%20phase.

1    or spine care.  *See id.* at 439-40.

2           Accordingly, this reason fails as well.

3                    **d.      Absence of Acute Distress**

4           Finally, the ALJ suggests that several additional observations in various progress notes,

5    which state that E.S. was "well-developed" and "not in acute distress," provide support for

6    rejecting her pain testimony.  *Id.* at 21 (citing *id.* at 288, 344, 434); 288 (UCSF Nurse Practitioner

7    Chin's July 11, 2017 routine notation that E.S. "appears well-developed and well-nourished"); 344

8    (Dr. Aaron Sterns' November 2015 progress notes from E.S.'s emergency room visit noting that

9    E.S. appeared "alert" and with "no acute distress" after presenting with chest pain); 434

10   (Healthright physician, Dr. Jacintho, routinely observes during January 2019 medication

11   management visit that E.S.'s "general appearance" is "well[-]developed" and well[-] nourished").

12          Again, none of these citations provide substantial evidence for rejecting E.S.'s pain

13   testimony.  Importantly, the cited routine findings did not in fact contradict E.S.'s account of her

14   pain; nor did the ALJ provide any explanation as to how the findings that E.S. was "well-

15   developed" and/or "well-nourished" are inconsistent with E.S.'s pain testimony.  *See Johnson v.*

16   *Kijakazi*, 2022 WL 1553259, at *2 (9th Cir. May 17, 2022) (concluding that ALJ failed to provide

17   substantial evidence for discounting claimant's testimony that she suffered from dizziness and

18   shortness of breath due to her cardiac impairments).

19          Of the three citations, only the July 11, 2017 visit was to E.S.'s orthopedist for the purpose

20   of addressing E.S.'s back impairments.  *See* A.R. 288.   Again, though, the ALJ has "cherry-

21   picked" one routine notation among many others from the visit.  At the July 11, 2017 visit, E.S.

22   sought treatment from UCSF orthopedist, Dr. Deviren, because she was working to "titrate down

23   off oxycodone," which she had been taking for back pain, and E.S. needed an epidural to address

24   her pain.  *Id.* at 287.  Significantly, during that July 11, 2017 visit, Nurse Practitioner Chin

25   observed that E.S. was experiencing pain with "significantly limited [range of motion]" in her

26   cervical, thoracic, and lumbar spine.  *Id.* at 289.  Additionally, E.S. tested positive at that visit on a

27   "left. . . straight leg-raise" test and on a musculoskeletal exam for "breakaway strength in lower

28

extremity . . . from severe back pain."[12]  *Id.*  That same day, Dr. Deviren diagnosed "multilevel

degenerative disc disease. . . characterized by disc space loss and mild retrolisthesis," and "facet

joint arthrosis . . . most severe in the lower lumbar spine."  *Id.*  Dr. Deviren subsequently ordered

physical therapy and an epidural later that same month.  *Id.* at 289-90.

     In sum, the ALJ's rejection of E.S.'s symptom testimony was not supported by substantial

evidence.  Remand is required for the ALJ to reconsider and accord appropriate weight to E.S.'s

symptom testimony.

### C.    ALJ's Evaluation of the Medical Opinions

     While the record contains abundant medical evidence regarding E.S.'s treatment for her

back impairments and related pain, especially from UCSF Spine Center clinicians from 2017-

2019, it is sparse in terms of medical *opinions*.[13]  The only medical opinion from an *examining*

clinician is that from PA Yeh, a physician's assistant at Healthright, where E.S. received pain and

medication management beginning in 2017.[14]  A.R. 767-69.  In addition to PA Yeh,  state agency

---

[12] The "straight leg raise test" is "a fundamental neurological maneuver during the physical examination of a patient with lower back pain that seeks to assess the sciatic compromise due to lumbosacral nerve root irritation."  Gaston O. Camino Willhuber & Nicolas S. Piuzzi, *Straight Leg Raise Test*, National Library of Medicine (June 22, 2022),  https://www.ncbi.nlm.nih.gov/books/NBK539717/.

[13] In 2017, the SSA considerably revised its definition of "medical opinion."  The updated regulations define a "medical opinion" as "a statement from a medical source about what [the claimant] can still do despite [their] impairment(s) and whether [they] have one or more impairment-related limitations or restrictions" in their "ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions . . . "  20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).  In revising the definition of "medical opinion," the SSA recognized that "[d]iagnoses and prognoses do not describe how an individual functions" and that although the SSA considers a claimant's statements about his or her symptoms, "[a] more appropriate focus of medical opinions would be perspectives from medical sources about claimants' functional abilities and limitations."  81 Fed. Reg. at 62,562; see also 20 C.F.R. § 416.913(a)(2), (3).  Thus, a medical opinion must discuss both a claimant's limitations and "what [the claimant] is still capable of doing" despite those limitations.  *Michael H. v. Saul*, 5:20-CV-417 (MAD), 2021 WL 2358257, at *6 (N.D.N.Y. June 9, 2021).

[14] For claims prior to March 2017, physicians' assistants were not considered "acceptable medical sources" but were instead considered an "other" medical source, whose opinions were not entitled to controlling weight.  *See* 20 C.F.R. §§ 404.1527(d); 416.927(d); *see also id.* § 404.1513(d) & (d)(1) (eff. Sept. 3, 2013 to March 26, 2017) (noting that "[o]ther sources include, but are not limited to . . . [m]edical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists)").  However, for claims filed after March 27, 2017, such as E.S.'s here, the SSA no longer distinguishes between an "acceptable medical source" and an "other medical source."  20 C.F.R. §

1   non-examining consulting physicians, Drs. DeSouza and Herman, offered RFC opinions on initial

2   review and reconsideration.  *Id.* at 59, 74.

3        PA Yeh submitted her RFC opinion on E.S.'s behalf on November 19, 2019, days after

4   E.S.'s hearing.  *Id.* at 767-69.  At the time, PA Yeh had personally seen E.S. twice.  *Id.* at 769,

5   780-81 (PA Yeh's September 10, 2019 progress notes following E.S.'s visit for injured toe).  PA

6   Yeh based her opinion on those visits and her review of E.S.'s medical records, including E.S.'s

7   MRIs.  *Id.* at 769.

8        PA Yeh opined that E.S. could lift less than ten pounds frequently and could lift ten

9   pounds occasionally.  *Id.* at 767.  She stated that E.S. was able to stand and walk and/or to sit

10  approximately two hours each per eight-hour workday.  *Id.*  PA Yeh further opined that E.S. can

11  never stoop, kneel, crouch, crawl, or climb stairs or ladders.  *Id.* at 768.  According to PA Yeh,

12  E.S. is also occasionally limited in her abilities to reach and to push and/or pull.  *Id.*  PA Yeh

13  stated that E.S. did not possess any "environmental restrictions," including limitations pertaining

14  to extreme temperature, wetness and/or humidity, noise, fumes or gases, and machinery and/or

15  heights hazards.  *Id.*  PA Yeh also opined that E.S.'s impairments would interfere with her

16  concentration or work approximately thirty percent of the time during a workday and would cause

17  her to be absent approximately three times per month.  *Id.* at 769.

18       Additionally, PA Yeh opined that E.S. would need to alternate sitting and standing/walking

19  positions at will – and approximately every ten minutes.  *Id.* at 767.  She further opined that E.S.

20  would need to walk for approximately ten minutes every hour, and that E.S. would also need to

21  "lie down at unpredictable intervals during a work shift."  *Id.*

22       In contrast to PA Yeh's opinion, in September 2017, state agency consultant Dr. DeSouza

23  opined that E.S. could frequently lift ten pounds and occasionally lift twenty pounds.  *Id.* at 59, 61.

24  Dr. DeSouza also opined that E.S. could sit six hours in an eight-hour workday and that she was

25  able to stand and/or walk for four hours.  *Id.*  According to Dr. DeSouza, E.S. could occasionally

26  climb ramps or stairs, stoop, kneel, crouch, and crawl.  *Id.* at 61-62.  E.S. could frequently balance,

27

28  _____

404.1520c.

but could never climb ladders, ropes, or scaffolds, or operate heavy machinery due to her use of pain medications. *Id.* Unlike PA Yeh, Dr. DeSouza did not offer an opinion regarding E.S.'s need to shift positions during the workday. *See id.* at 59-61. In November 2018, state agency consultant, Dr. Herman, adopted Dr. DeSouza's prior RFC opinion on reconsideration. *Id.* at 73-75.

The ALJ rejected PA Yeh's opinion as "inconsistent with and [not] supported by the medical evidence."[15] *Id.* at 22. Regarding E.S.'s need to shift positions, the ALJ found that E.S. needed to alternate between sitting and standing "momentarily each hour rather than at will," as stated by PA Yeh. *Id.* at 767, 22. In terms of the remainder of PA Yeh's opinion, the ALJ concluded that it was "overly restrictive," noting that E.S.'s "physical examinations showed minimal findings," she "did not have swelling, edema, deformity, or spasms," and that her "gait was typically normal." *Id.* at 22.

Instead, the ALJ found the state agency consultants' RFC opinions persuasive and adopted all of the limitations contained therein. *Id.* The ALJ concluded that the opinions were "consistent with and supported by the medical evidence," noting simply that E.S.'s "gait was typically normal." *Id.*

### 1. Legal Standards

For claims filed before March 27, 2017, "[t]he medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Trevizo*, 871 F.3d at 675 (quoting 20 C.F.R. § 404.1527(c)(2)). However, the regulations regarding evaluation of medical evidence have been amended and several of the prior Social Security Rulings, including Social Security Ruling 96-2p ("Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions"), have been rescinded for claims filed after March 27, 2017, as is the case here. *See* Revisions to Rules, 2017

---

[15] The ALJ, however, agreed with both PA Yeh and the state agency consultants that E.S. possessed no limitations regarding extreme temperature, wetness and/or humidity, noise, fumes or gases. A.R. 22.

1  WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017); *see also* 20 C.F.R. §§ 404.1520c (a),

2  416.920c(a).

3       The new regulations provide that the Commissioner "will no longer give any specific

4  evidentiary weight to medical opinions; this includes giving controlling weight to any medical

5  opinion."  20 C.F.R. § 416.920c(a).  They "displace [the Ninth Circuit's] longstanding case law"

6  requiring an ALJ to articulate "specific and legitimate reasons" for rejecting a treating physician's

7  opinion where the opinion is contradicted by other medical opinions.  *Woods v. Kijakazi,* 32 F.4th

8  785, 787, 791 (9th Cir. 2022).  Accordingly, the ALJ here was not required to provide "specific

9  and legitimate" reasons for rejecting E.S.'s examining PA's opinion.

10       Under the new regulations, the Commissioner instead must consider all medical opinions

11  and "evaluate their persuasiveness" based on the following factors: 1) supportability; 2)

12  consistency; 3) relationship with the claimant; 4) specialization; and 5) "other factors."  20 C.F.R.

13  § 416.920c(a)-(c).  The two "most important factors for determining the persuasiveness of medical

14  opinions are consistency and supportability," which are the "same factors" that "form[ed] the

15  foundation of the [prior] treating source rule."  Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853;

16  *see also Woods*, 32 F.4th at 791-92.  The ALJ is required to explicitly address supportability and

17  consistency in their decision.  20 C.F.R. § 404.1520c(b)(2).  As with all other determinations made

18  by the ALJ, the ALJ's persuasiveness explanation must be supported by substantial evidence.  *See*

19  *Woods,* 32 F.4th at 787.

20       With respect to "supportability," the new regulations provide that "[t]he more relevant the

21  objective medical evidence and supporting explanations presented by a medical source are to

22  support his or her medical opinion(s) or prior administrative medical finding(s), the more

23  persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. §

24  416.920c(c)(1).  Regarding "consistency," the regulations provide that "[t]he more consistent a

25  medical opinion(s) or prior administrative medical finding(s) is with the evidence from other

26  medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s)

27  or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(2).

28       Typically, the ALJ "may, but [is] not required to," explain how they considered the

United States District Court
Northern District of California

remaining three factors listed in the regulations. *Id.* However, where two or more distinct medical opinions are equally supported and consistent, the ALJ should articulate how they considered factors other than supportability and consistency, including the treatment relationship, the extent of specialization, and any other relevant factors. *See* 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3); *see also Woods,* 32 F.4th at 792 (discussing 20 C.F.R. § 404.1520c(b)(3)) ("In that case, the ALJ 'will articulate how [the agency] considered the other most persuasive factors.'").

### 2.    Analysis

At the outset, the Court notes that the ALJ blurred the analysis of the supportability and consistency factors as to both PA Yeh's and the state agency consultants' opinions, failing to articulate which evidence supported the findings regarding each factor. A.R. 22; *see Woods*, 32 F.4th at 792 (An ALJ "cannot reject an examining . . . doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence."). Such conflation of the supportability and consistency factors rendered the ALJ's analysis insufficient under the revised articulation requirements. *See* 20 C.F.R. § 404.1520c(b)(2) (Under the revised articulation requirements, an ALJ must "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions" when determining how persuasive they find that source.); *see also Labryssa v. Kijakazi*, No. 21-CV-04233-BLF, 2022 WL 2833981, at *6-7 (N.D. Cal. July 20, 2022) (noting Ninth Circuit's recent opinion in *Woods* and concluding that ALJ must engage with a medical opinion in a "meaningful sense" in evaluating consistency and supportability factors, and that a "passing assessment," which fails to "substantively engage" with the medical opinion, is not supported by substantial evidence).

Nevertheless, the Court has considered each of the ALJ's proffered reasons and concludes that the ALJ engaged in the same type of "cherry-picking" of evidence in his evaluation of the medical opinions as was the case with E.S.'s symptom testimony.[16] The ALJ's treatment of the

---

[16] The Commissioner also offers numerous additional *post hoc* citations to the record in arguing that the ALJ properly rejected PA Yeh's opinion. *See* Dkt. No. 26 at 13. However, the Court "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Orn v. Astrue*, 495 F.3d 625, 630 (9th

1   medical opinions, therefore, was not supported by substantial evidence.

2       The ALJ's reasons and supporting record citations were identical to those the ALJ cited in

3   rejecting E.S.'s testimony.  A.R. 22.  Again, the ALJ relied on E.S.'s "typically normal" gait.  *Id.*

4   (citing *id.* at 297, 439, 747, 752).  As discussed above, E.S., in fact, presented with an "antalgic"

5   gait at one of the visits cited by the ALJ.  *Id.* at 747.  Moreover, the routine findings regarding

6   E.S.'s "gait" did not undermine PA Yeh's opinion considering that E.S. simultaneously exhibited

7   increasingly intense pain and other difficulties balancing and walking.  *See id.* at 743, 297.  Nor

8   did the observations regarding E.S.'s gait – the sole reason offered by the ALJ – support the ALJ's

9   finding that the state agency consultants' opinions were more persuasive than PA Yeh's opinion.

10       In concluding that PA Yeh's opinion was not persuasive, the ALJ also misconstrued the

11   medical evidence by suggesting that E.S.'s "physical examinations showed minimal findings"

12   simply because she "did not have swelling, edema, deformity, or spasms" during a September 25,

13   2017 follow-up visit to Dr. Deviren at UCSF or at a November 2015 emergency room visit to Alta

14   Bates Hospital.  *Id.* at 22 (citing *id.* at 321, 344).  Significantly, the November 2015 emergency

15   room visit that the ALJ cites to was for chest pain as opposed to back pain.  *Id.* at 344.  Further, at

16   the September 2017 visit cited to by the ALJ, E.S. continued to present with back pain and

17   received an epidural that very day.  *Id.* at 321.

18       In sum, again, the objective medical evidence demonstrated that E.S. persistently suffered

19   from multiple back impairments.  While the intensity of E.S.'s pain waxed and waned throughout

20   the years depending on the timing and effectiveness of epidurals and medications, injuries caused

21   by falls, and the progressive degeneration of her impairments as she aged, it remained continuous

22   and interfered with E.S.'s activities of daily living.  Given the Court's review of the broader

23   medical record, the ALJ's citation to select notations within select progress notes does not

24   constitute substantial evidence supporting the ALJ's evaluation of the medical opinions.[17]  The

25   _____

26   Cir. 2007).

27   [17] The Court rejects the Commissioner's argument that any error in evaluating the medical
     opinions was harmless based on the ALJ's inclusion of a limitation regarding E.S.'s need to

28   alternate positions during the workday.  As discussed below, the Court concludes that the ALJ
     failed to fully develop the record as to E.S.'s need to shift positions and further erred when he

United States District Court
Northern District of California

ALJ is, therefore, required to reweigh the medical opinions from PA Yeh and the state agency consultants on remand.

Moreover,  because PA Yeh's opinion was at least as supportable and consistent with the longitudinal record as the state agency consulting physicians' opinions, on remand, the ALJ is required to consider the remaining three factors – treatment relationship, specialization, and any "other factors" -- with respect to all three opinions.  *See* 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3) (ALJ should articulate how they considered factors other than supportability and consistency, including the treatment relationship, when they find two or more medical opinions about the same issue equally well-supported and consistent with the record); *accord Woods,* 32 F.4th at 792 (citing 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3)) (noting that when "'two or more medical opinions . . . about the same issue are . . . equally well supported . . . and consistent with the record. . . but are not exactly the same,' . . . the ALJ 'will articulate how [the agency] considered the other most persuasive factors'").

**D.      ALJ's Failure to Develop the Record**

E.S. also argues that the ALJ failed to fully develop the record prior to assessing her RFC. For the reasons that follow, the Court agrees in part as pertains to the functional limitations related to E.S.'s need to alternate positions during the workday.

**1.      Legal Standards**

While it is true that the claimant bears the overall burden of proving disability, the ALJ in a social security case bears an independent and "'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'"  *Smolen*, 80 F.3d at 1288 (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)).  Importantly, this duty extends not only to unrepresented claimants, but also to cases where the claimant has representation.  *See id.*; *see also Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003).

The existence of ambiguous or inadequate evidence triggers the ALJ's duty to "conduct an appropriate inquiry."  *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (quoting *Smolen*,

---

substituted his independent judgment for the opinion of the only examining medical source on point, PA Yeh.

United States District Court
Northern District of California

80 F.3d at 1288).  "The ALJ may discharge this duty in several ways, including:  subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record."  *Id.* (citations omitted).  The regulations additionally provide that the ALJ may order further consultative examinations to "resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision."  *See* 20 C.F.R. § 404.1519a.  Further development of the record is required when the additional evidence needed is not contained in the records of the claimant's medical sources, and when highly technical or specialized medical evidence not available from the claimant's medical sources is needed.  *See id.*  Once the duty to further develop the record is triggered, failure to do so constitutes reversible error.  *See Tonapetyan*, 242 F.3d at 1150–51.

### 2.    Analysis

E.S. contends that the ALJ failed to properly develop the record when he declined to order a consultative physical examination.  E.S. notes that PA Yeh was the only examining medical source to render an opinion, and argues that a consultative examination was required because the ALJ rejected PA Yeh's opinion.  The Commissioner counters that the ALJ had no duty to further develop the record because there was no ambiguity or inadequacy that triggered the duty.  E.S. replies that the Ninth Circuit no longer requires an ambiguity or inadequacy prior to triggering a duty to develop the record.  *See* Dkt. No. 29 at 10 (citing *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011)).

E.S., however, misinterprets the Ninth Circuit's decision in *McLeod*.  The *McLeod* decision left intact the ambiguity or inadequacy requirement, and simply clarified that the ALJ need not make "a specific finding of ambiguity or inadequacy."  *McLeod*, 640 F.3d at 885.  Instead, the duty is triggered "where *the record* [*itself*] establishes the ambiguity or inadequacy."  *Id.* (emphasis added).

Here, although the ALJ rejected PA Yeh's RFC opinion, the ALJ accepted the state agency consultants' RFC opinions and, for the most part, based his RFC assessment on those opinions.  *See* A.R. 22 (finding the state agency consultants' opinions "persuasive").  The ALJ's decision to

United States District Court
Northern District of California

adopt the non-examining consultants' opinions did not in and of itself render the record

ambiguous or inadequate *regarding the limitations actually contained in those opinions.*[18]  *See*

*Larsen v. Kijakazi*, No. 18-55398, 2022 WL 1537365, at *2 (9th Cir. May 16, 2022) (ALJ did "not

err by failing to order a physical consultative examination prior to rendering his decision where

[the claimant did] not identify any ambiguity or inadequacy in the medical record requiring such

further development.").

However, as E.S. notes, the state agency consultants' RFC opinions were silent regarding

E.S.'s need to shift positions during the workday, thus giving rise to an important ambiguity

and/or inadequacy in the record.  *See* A.R. 59-62, 73-74; Dkt. No. 21 at 15.  In contrast to the state

agency consultants, PA Yeh's opinion acknowledged E.S.'s need to alternate positions due to her

back impairments and related pain.  A.R. 767.  However, the ALJ rejected PA Yeh's opinion on

the issue, finding that E.S. need only shift positions "momentarily each hour rather than at will as

stated by [PA] Yeh."  *Id.* at 22 (noting that in doing so, "[E.S.] would not be off task with

headphones").  The ALJ did not cite to any medical evidence or opinions in support of this RFC

finding.  *See id.*

The ALJ's rejection of PA Yeh's medical opinion – the only medical opinion regarding the

limitation at issue -- rendered the record "inadequate" or "ambiguous" and triggered the ALJ's

duty to develop the record regarding E.S.'s need to alternate positions.  *See Bayliss v. Barnhart*,

427 F.3d 1211, 1217 (9th Cir. 2005) (The record will be considered "inadequate" or "ambiguous"

when a medical source has provided a medical opinion that is not supported by the evidence.).

Instead of ordering a consultative examination or seeking the opinion of a medical expert, the ALJ

independently assessed the required functional limitation, which was itself error.  *See Terrell W.

v. Saul*, No. 19-CV-07274-JSC, 2021 WL 461893, at *3 (N.D. Cal. Feb. 9, 2021) ("[An] ALJ's

RFC determination or finding must be supported by medical evidence, particularly the opinion of

a treating or an examining physician."); *Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal.

---

[18] As discussed above, the Court nevertheless concludes that, for other reasons, the ALJ's
evaluation of the state agency consultants' opinions was not supported by substantial evidence.

2006) ("An ALJ cannot arbitrarily substitute [their] own judgment for a competent medical opinion, and [they] must not succumb to the temptation to play doctor and make [their] own independent medical findings"); *see also Russell C. v. Saul*, No. 20-CV-256-MMA (RBM), 2021 WL 1116034, at *4 (S.D. Cal. Mar. 24, 2021) (quoting *Banks*, 434 F. Supp. 2d at 805) (The ALJ's "lack of a relied-upon medical opinion coupled with the ALJ's analysis reveals the ALJ's RFC finding 'is evidently nothing more than the ALJ's own exploration and assessment of E.S.'s impairments.'").

The Commissioner suggests that the ALJ based his articulation of the RFC limitation on E.S.'s presentation at the hearing. *See* Dkt. No. 26 at 21. However, the Court is "constrained to review the reasons the ALJ asserts," and, here, the ALJ asserted none. *Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015); *see also Orn*, 495 F.3d at 630 (stating that the court "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely"). Moreover, in any case, the Ninth Circuit does not permit the ALJ to rely on his own limited observations regarding a plaintiff's presentation at the hearing to assess functional limitations contrary to an examining physician's medical opinion. *See Perminter v. Heckler*, 765 F.2d 870, 872 (9th Cir. 1985) (noting that an "ALJ's reliance on [her] personal observations of [the claimant] at the hearing has been condemned as 'sit and squirm' jurisprudence"); *accord Nadya I. v. Saul*, No. 19-CV-04373-TSH, 2020 WL 5232529, at *17 (N.D. Cal. Sept. 2, 2020); *P.E. v. Saul*, 445 F. Supp. 3d 306, 333 (N.D. Cal. 2020).

Finally, contrary to the Commissioner's suggestion, the error was not harmless. After assessing Plaintiff's RFC, the ALJ subsequently posed a hypothetical to the VE utilizing a limitation identical to that articulated in his RFC assessment, inquiring whether an individual who "must alternate standing with sitting *momentarily* each hour" in a manner that was not "off-task" and used headphones could still perform the E.S.'s past work. A.R. 49 (emphasis added). The VE responded affirmatively, and the ALJ subsequently found E.S. not disabled.[19] *See id.* at 49, 22.

---

[19] When the ALJ modified that hypothetical to require that the individual "rest off-task for ten minutes every hour," as PA Yeh opined, the VE testified that such a limitation would "eliminate competitive employment." A.R. 50.

For these reasons, having rejected PA Yeh's lone RFC opinion regarding E.S.'s need to shift positions, the ALJ's subsequent iteration of that RFC limitation was not supported by substantial evidence when he failed to develop the record further.  As noted, the Court has already ordered the ALJ to re-evaluate the existing medical opinions on remand.  In the event the ALJ again rejects PA Yeh's RFC opinion regarding E.S.'s need to alternate positions, the ALJ is required to further develop the record by ordering a consultative examination and/or obtaining the opinion of a medical expert prior to making any RFC findings on the issue.

**E.  ALJ's RFC Determination**

An ALJ assesses a claimant's RFC "based on all the relevant evidence in [the] case record." 20 C.F.R. § 416.945(a)(1).  The ALJ must consider both the medical evidence and "descriptions and observations of [the claimant's] limitations from [the claimant's] impairment(s), including limitations that result from [the claimant's] symptoms, such as pain, provided by" the claimant, family, friends, and other people.  *Id.* § 416.945(a)(3).

As discussed above, the Court concludes that the ALJ erred in several respects, including: (1) in rejecting E.S.'s symptom testimony; (2) in evaluating the medical opinions from PA Yeh and the state agency consultants; and (3) in failing to further develop the record regarding E.S.'s need to shift positions during the workday.

The ALJ's assessment of E.S.'s RFC was tainted by these errors and, therefore, was not supported by substantial evidence.  Accordingly, on remand, the ALJ is required to reassess E.S.'s RFC in accordance with the Court's rulings on the other issues above.

**F.  ALJ's Failure to Address Step Five**

Finally, the ALJ concluded that E.S. could perform her past work at step four and terminated the sequential analysis prior to reaching step five, based on a VE hypothetical that was also tainted by the errors listed above.  *See* A.R. 33-34, 130-34; *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989) (An ALJ may meet their step five burden by propounding to a vocational expert a hypothetical based on medical assumptions supported by substantial evidence in the record.); *Tackett*, 180 F.3d at 1101 (ALJ's depiction of the claimant's impairments must be "accurate, detailed, and supported by the medical record"); *accord Valentine v. Comm'r Soc. Sec.*

1   *Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  On remand, the ALJ is also required to propound a

2   new hypothetical to the VE, accounting for the ALJ's reconsidered findings regarding E.S.'s RFC.

3   **V.      CONCLUSION**

4          E.S. asks the Court to remand for payment of benefits.  The Social Security Act permits

5   courts to affirm, modify, or reverse the Commissioner's decision "with or without remanding the

6   case for a rehearing." 42 U.S.C. § 405(g).  "[W]here the record has been developed fully and

7   further administrative proceedings would serve no useful purpose, the district court should remand

8   for an immediate award of benefits." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004).

9   However, "[r]emand for further proceedings is appropriate where there are outstanding issues that

10  must be resolved before a disability determination can be made, and it is not clear from the record

11  that the ALJ would be required to find the claimant disabled if all the evidence were properly

12  evaluated." *Luther v. Berryhill*, 891 F.3d 872, 877–78 (9th Cir. 2018) (citations omitted).

13         It is not clear from the record here that the ALJ would be required to find E.S. disabled if

14  all of the evidence were properly evaluated.  Therefore, remand is appropriate.  As discussed

15  above, on remand, the ALJ must reconsider: (1) E.S.'s symptom testimony; (2) the weight

16  accorded the medical opinions from PE Yeh and the state agency consulting physicians; (3) E.S.'s

17  RFC; and (4) at steps four and five, whether E.S. is able to perform her past work and/or whether

18  work exists in significant numbers given E.S.'s recalibrated RFC and the revised VE hypothetical

19  that accounts for E.S.'s recalibrated RFC.  Additionally, if the ALJ again rejects PA Yeh's RFC

20  opinion regarding E.S.'s need to shift or alternate positions during the workday, the ALJ is

21  required to further develop the record on that issue by ordering a consultative examination and/or

22  by seeking an opinion from a medical expert.  The Court recognizes that the ALJ may discharge

23  this duty in several ways and defers to the ALJ to determine the appropriate method. *See*

24  *Tonapetyan*, 242 F.3d at 1150.

25         Based on the foregoing, E.S.'s motion for summary judgment is GRANTED, the

26  Commissioner's motion for summary judgment is DENIED, and this matter is remanded for

27  further proceedings consistent with this order.  The Clerk shall enter judgment accordingly and

28  close this file.

United States District Court
Northern District of California

1      **IT IS SO ORDERED.**

2

3    Dated:  September 16, 2022

4

5

6    _____

7    JOSEPH C. SPERO
     Chief Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California